oral argument not to exceed 15 minutes per side counsel desk Gupta for the defendant's appellant. Your honors, my name is Riddhi Das Gupta and I represent defendant's appellants here. May it please the court. The jury instruction and I would like to reserve two minutes for rebuttal. The jury instruction that the defendants had proposed was that the defendants intended to and their conduct did substantially facilitate the alien remaining in the U.S. illegally and the term harboring encompasses conduct with the intent to substantially facilitate an alien remaining in the U.S. illegally and to prevent government authorities from detecting his or her unlawful presence. Then the district court proposed its instruction that the defendant intended to and their conduct did substantially facilitate the alien remaining in the U.S. illegally. In the end, however, the district court gave these instructions. Jury instruction 19-7 defining harboring as the term harboring encompasses. Where did your instruction come from the intended to that sort of language? Where does that arise? Where does that come from? You mean the provenance of that, I think that. As opposed to what the district court used intended to. Well, your honor, other districts all over the country, including in the second circuit, they have frequently used the intended to language and it is our submission that, does your honor mean that where did the final jury instruction come from? No, your proposed instruction. You wanted the district court to say intended to and sort of figure out where your authority for that comes from. Well, your honor, we wanted that instruction because that is what many other districts all over the country have used and it seemed to us to faithfully track what 1324A1A3 says. Because we thought, as we thought then and we think here, that. There is no intent requirement in that particular subsection. It refers to knowing or reckless disregard. So where do we get to intent? Well, because it is our view as it was the view of Judge Livingston in writing for the majority in Vargas Cordon in the second circuit that because it is a criminal statute that can punish people for up to five years, intentionality is in fact the scienter, the mens rea is a part of the statute. So the knowledge and reckless disregard that pertains to the defendants knowing the status of the alien, but the intent aspect of it refers to the defendants concealment, harbor, and shielding. And your honor, recently in the Ruan case. Well, you can finish your sentence. I am going to ask you a question. I appreciate that, sir. And in the Ruan case, the Supreme Court tracked the fact that in criminal matters, culpable state of mind, the mens rea thereof is a presumption. The courts have to run with that presumption and the court, even in Ruan, the Supreme Court was not writing on a blank slate. They went through the whole litany of cases of that court, including Rafe versus United States, and pointed out that the intent aspect of it is a well and truly part and parcel of all criminal statutes. Well, I mean, Ruan, is that the case that talks about the background principle that we don't want to punish innocent conduct and that absent reason to think otherwise, there is going to be a certain mens rea for each element of the offense? Is that the case that has that rule? Or is it a different case? I think that that's certainly one of the corollaries of Ruan. What was Ruan's holding again? Ruan said that there is a presumption of signatory in criminal statutes when a statute is not silent as to mens rea, but instead includes a general signatory provision. The presumption applies with equal or greater force. To that end, the court cited Rafe, its own precedent. And then they said that in that application, in that case, the word knowingly modifies not only the words directly following it, but also other statutory terms that separate wrongful from innocent acts. So here, I mean, the statute says knowingly or with reckless disregard, if I recall. And then you want to escalate that sort of as to the harboring, let's just say the harboring, which kind of encompasses concealing as well. You want to say it's a higher mens rea as to the harboring element. Is that, that's your argument? Your Honor, I don't know if I would necessarily characterize it as escalating it, but we're simply saying that there has to be something more than the recumbent low bar of 10-2 substantially. And intentionality is the traditional standard that's used in these contexts. Well, are you getting at that Susnahar case or whatever? Yes. So Susnahar is a 95-year-old precedent of this court that this court, and we found unpublished opinions that this court has later on referred to it. But the Seventh Circuit in Costello seemed to have relied on it, Judge Posner's opinion joined by Judge Wood. The Second Circuit, Your Honor, we mentioned this in our brief, Vargas-Cordon. There's a whole line of precedent, Kim, Vargas-Cordon, George. In all those cases, the Second Circuit seems to have taken, given the interpretation that we're favoring as to the application of intent to the harboring provision. Well, I mean, if we just set aside precedent for a moment and just try to take a fresh look at what this means, I mean, is your argument that harboring itself, that term, that concept, just inherently requires intent to prevent detection by authorities? It's just in the nature of that word, that concept. Is that kind of the core of your argument here? Well, in part, Your Honor, I mean, the word harboring, the government likes to say that this is from a 1950s iteration of statutory iteration. They've cited 1950s dictionaries. We think, as Judge Livingston taught in Vargas-Cordon, that this actually goes back to the 1917 statute enacted by Congress. And if Your Honors consult the dictionaries of that time, again, Judge Livingston did that for us. But as have we, Black's Law Dictionary from 1910, Black's Law Dictionary, that's the second edition, then the Black's Law Dictionary from 1933, third edition, they all refer to clandestine and, well, shielding, sheltering, clandestine. And there is an element of intent, to answer Your Honor's question, which I hope I'm doing, in the word harboring, because it's very difficult to just sort of accidentally harbor. But also, given the statutory context and structure of 1324A1A3, Your Honor, it seems to us that intent is reinforced by the language of that statute. How is that so? Well, I don't mean that. It's somebody else. Your Honor? Well, I understand the 1986 amendments removed mens rea from harbor. And if that being so, we don't have to be terribly concerned about the intent issue with respect to that word. But after the 1986 amendment, that sort of undermines your argument, doesn't it? Well, we respect, we understand the government has made that point. And we respectfully disagree with that argument for the same reason that the Second Circuit did. Because we don't think it, we believe it's a red herring. Because they did, they did, the government did, I'm sorry, the statute did change, you know, change the adverbs or switch it or switch the adverbs around a little bit. But that just meant that they, that they added knowingly and knowing and reckless disregard to the aspect of knowing the legal status of the alien. That, but that's a different thing from saying that we're taking the mens rea, the intentionality out of the conduct itself. They did not do that. Because intent, unless it's, unless specifies otherwise, intent is the default culpable state of mind. And Congress just left that default in. It just, but it just changed knowingly and willfully and so on and moved that, moved knowing and reckless disregard to a different provision of the same statute. Well, just to understand your argument, how would your argument work if the defendant is aware that he's offering housing and board and employment and in a sense he's harboring an individual or the immigrant in that way, are you saying that he has to know that that constitutes a violation of the law? Is that, is that how you're interpreting this intent factor or no? Well, we're saying that the, we're saying that the defendant has to know that the, that the, that the, you know, they have to know that the individual does not have legal status, but on top of that they have to know that their conduct is in fact the steps they're taking, the conduct they're engaged in, that is in fact harboring them. So. Well, I mean, they know they're harboring them because they're providing these means of succor and sustenance, so they know that. And if they know that it's, they're doing that with respect to an immigrant, why wouldn't that be sufficient under the statute? Because they were not hiding them, your honor, and they were not hiding these individuals in any real sense of the word. Well, that's for the jury to determine. If they've got the people living in their basement and they're not being, they're told to stay in the basement and pretty much to conceal themselves, it's up to the jury to determine if that constitutes a violation of the statute. Well, we respectfully think that the record here, and I know I'm running short on time, the record here doesn't show that they were being told to hide in the basement. They had cell law enforcement officers came to the restaurant to see them and so on and so forth. That's an issue of fact for the jury as to whether these people were being concealed or, as you say, harbored or whatever. That's left for the jury. We don't have to determine that as a matter of law here, do we? Well, your honor, given the attempt to facilitate instruction that the court gave, we think that that choice was taken away from the jury. The jury, frankly, really had no choice but to render the verdict they kind of did. If the jury had been given the right instruction and if this case were to go back to trial, we think that there's a very good probability that the verdict would be different because the record is kind of, you know, there's testimony from the defendant, one of the defendants, testimony from other people showing that there was no attempt to hide these people. Of course, they were staying at the house. I think we have your argument in hand and your light's been on for a while now. Yeah. Why don't we hear from the government? Thank you, your honor. Good morning, your honors. May it please the court. Javier Sinha on behalf of the United States. Morning. The defendants are asking this court to read into the word harboring a sort of baked-in intent to prevent detection requirement, but neither the structure nor history of the statute allows that interpretation. And I want to sort of make clear that there's two distinct things here. One is the mens rea for the acts here. The other is the men's rea for the actions. I don't understand the defendant's brief or objection below to be about the men's rea for the acts. I understand it to be about the definition of the word harboring itself and whether that word has a baked-in requirement of intent to prevent detection. I mean, they're basically saying they're doing this because they want to help these folks avoid detection. Not just they know it, but they want that outcome. That's intent, right? Harboring would require that, exactly. But I don't think they're saying that the mens rea for concealing, harboring, and shielding from detection should be something different. I read it as an argument about the word in harbor. Yeah. I mean, that's what we're focused on today is harbor. Yeah. And I think that if you look, Congress said that reckless disregard for the non-citizen status satisfied the mens rea here. And if harboring has a built-in intent to prevent knowledge about that that would essentially require knowledge itself and would essentially judicially excise in the statute this reckless disregard language. Well, no. I mean, you've got a general intent requirement of knowing a reckless. Correct. And then they're saying that as to the element of harboring, there's a specific intent required that you actually want to help this person avoid detection. Not just that you know it's likely to be the outcome, it's that that's why you're doing this. So if you're trying to help someone avoid detection of their unlawful status, you have to know about that status. Right. And if the only mens rea... But it's more than that. Correct. But so reading that to require you to know about their status wouldn't allow for reckless disregard of their status to be enough to satisfy the mens rea as Congress required. It would seem to go against the structure of the statute itself. Yeah. No, I understand. So, I mean, you're saying that if harboring already requires an intent to help the person avoid detection of their status, then why would you have a general intent requirement of knowing a reckless as to the status? Correct. But it's just one of several ways of violating the statute. If I was arguing Mr. Dasgupta's position, I might say, well, you know, it's not surplusage, the general intent language, because we have all these other ways of, you know, means of violating the statute, not just harboring. It would be surplusage as to harboring. Yeah, well, but it's not surplusage, which means, as I've learned, you know, having the Supreme Court disagree with me, then if it's not surplusage, period, it's not surplusage. Correct. But it does show the structure of the statute doesn't support their argument. I think the same is true of the 1952 statute from which this is sort of based, although with amendments. That statute required that the acts being done be done knowingly or willfully, and there would be no need to require the word knowingly in there if there's a sort of built-in intent requirement to harbor, because, again, that would be surplusage for the word harbor. I get that. I mean, Mr. Dasgupta points out, at least in his argument, that he thinks the Second Circuit and the Seventh Circuit agree with him, the Second Circuit in that Vargas case. I mean, what's your read of those opinions, and would we create a circuit split if we agreed with your interpretation? The Second Circuit does seem to agree with the defendant's interpretation. The Seventh Circuit, I don't think, does. Which one, the Second? The Second, yes, Your Honor, in the Vargas-Cordone case. The Seventh, I don't think, does. The Seventh, in Costello, says, when harboring is based purely on providing shelter, then you have to show this intent element to separate sheltering from harboring. But, you know, in Costello, Judge Posner says, you know, employing someone to cook in your kitchen, for example, would be a perfect case of harboring. And so Costello, I think, is entirely consistent with the government's position. Yeah. But it's interesting. So, I mean, the position you're advocating probably creates a circuit split with the Second Circuit. With the Second. It's not that that's the end of the world, but that's, you know, that's interesting. We argued this in Second Circuit as well. We think, again, the statute structure doesn't allow for a finding of, or a reading harboring to include this intent element. And a lot of the defendant's argument relies on Cisengar, which is a 1970, which interprets a different statute, in this case. So you make the structural argument. I mean, what about just the meaning, let's just forget about the structural argument. What about the meaning of harboring itself? I mean, what do you have to say about their kind of linguistic, you know, intuition, that that requires not just knowing, but intent? So we said to a number of dictionaries that don't seem to suggest that it requires intent. The only one we could find from the 1950s when this statute was passed is the Black Saw Dictionary, which cites to an 1847 Supreme Court case interpreting the Fugitive Slave Act, which is not very helpful here because of the context. And so the word, I don't think, has to necessarily require this sort of intent. It could be read that way. I don't think it should. And especially when, in this case, where we read statutory terms in context, and in light of the terms that surround it, I think it can't be read that way in this statute. I'll also quickly point out, so just to go back to this jar very quickly, because I was interpreting a different statute, it's not binding on this court and interpreting this statute. It can at most be persuasive, and it's not even very persuasive because the 1952 statute, which repealed the 1917 statute, is so different from that statute. Your Honors, I'm happy to keep talking about this if you'd like. I'm happy to also talk about, just quickly, the harmless error argument we make. The defendants cite to Nieder and say Nieder requires that the element be uncontested for harmlessness. That's simply not the case. Nieder makes clear that the Chapman v. California general harmless error standard applies. This court has said as much in the Messamjack case, which we cite on page 18 of our brief, and the Kuhn case, which we cite on page 26 of our brief. Every court of appeals of which we are aware that has been presented with that argument has rejected it. I'm happy to provide the court with citations to that in the post-argument letter if the court would like. And here, as Your Honors mentioned, there's a lot of evidence that even if this sort of intent element was read into the harbor, that the defendants had that intent. They kept them in the basement, having only one door that led to the backyard. They were told not to go outside too much, not to make too much noise because they could be deported. They were paid only in cash. They were not put on the payroll. Their names weren't submitted to the state. Their names weren't submitted in any tax forms to the federal government. In the restaurant, they were kept in the kitchen, which was separated from the main dining room. And then, of course, Francisco Pedro wasn't allowed to sit in the main dining room. When he burnt his hand, he wasn't allowed to go to the hospital for two days because the defendants worried that he would be discovered as a non-citizen legally present. Well, on the Nieder issue, I mean, just to be precise about the showing they would need to make as to harmlessness, I mean, Nieder itself says all they have to do is show that it's contested and, so it's more than contested, but and raised evidence sufficient to support a contrary finding. So if a reasonable jury could find, based on the evidence that they put in, an absence of intent, then it's harmful. So correct. So Nieder's... That's a correct standard, right? So yeah, correct. So it has to be the standard from Chapman v. California, which is, you know, absent the error, would a reasonable jury have found them guilty on a reasonable doubt? Well, that's, I don't, I mean, Nieder says what it says. Did it cite Chapman right after that? Nieder does cite Chapman at some point. I don't have it right in front of me. I mean, I'm looking at what Nieder says, and it's saying if, I mean, Chapman's about whether the government put in sufficient evidence, right, to support a conviction. Correct. And here, and here, it's just, you know, could a rational jury agree with the government there? And here, it's could a rational jury agree with the defendant? So it's the same sort of sufficiency standard, but it's favoring the defendant here, because if any rational juror could agree with one or the other, that's pretty easy. So didn't they meet that? I mean, the defendant testified that she didn't have the intent. Jury issue, harm, right? So I'm not sure that that's right about the way we read Nieder. This court has read it to just apply the general Chapman standard, and like I said, and Masson-Jack, which we cite in our brief on page 18, and Kuhn, which we cite on page 26. But I think regardless of the correct standard, which I think is, correctly, the Chapman standard, you know, the jury found here that the defendants acted for the purpose of commercial advantage or private financial gain. And so the jury found that they were harboring these non-citizens, or concealing them, or shielding them from detection, which any of the three could satisfy the harmless error standard here, because the jury was instructed on all three of them. And so the jury found they did all those things, you know, for financial gain, essentially. And it's very hard to say that they did this for financial gain, and that they had all the evidence that they tried to hide these people, didn't pay them checks like they did the other employees, they didn't put their names on any forms, but they didn't intend to sort of prevent their detection. You know, I think the jury could rationally see that. They said, well, don't go outside too much, you might get discovered, or we can't take Francisco Pichardo to the hospital, because if we do, he might be discovered as being non-citizen. And that they did all that for their financial gain, and say, well, clearly that's being done with the intent to prevent law enforcement detection. What about this argument that the illustrative examples in the jury instructions invaded the province of the jury? Do you have anything more to say about that? I'll just quickly say that, you know, the district court said that employment and providing housing may be harboring, but it didn't have to be. That's an instruction the defendants themselves requested. They later changed their mind on that, but it's a correct statement of law, and it doesn't actually find any facts. The jury still has to find whether or not the defendants did provide employment or housing, and if they did, whether that constituted harboring or not. And so there's no way in which the district court made a fact-finding here for the jury, and the court even explains to the jury that my job is to seek the law, the jury's job is to find fact. Your Honor. All right. Thank you very much, Your Honors. Thank you. Thank you, Your Honors. I just have a few points to make on rebuttal. Thank you, sir. It is that, first of all, under this court's precedent in Sassnachar, defendants have to intend to shield from law enforcement or immigration authorities the harboring that they're engaged in. That's how the Sassnachar court defines it. Let's say we don't think that case is binding or particularly helpful here. What do you want to talk about in your last three minutes? Okay. Well, I think that if Your Honors don't think Sassnachar is helpful, we think that Vargas-Cordon certainly is helpful, that line of precedent that the Second Circuit has built up, and it's very favorable to us. Speaking of Vargas-Cordon, there the U.S. government's entire position was that that jury instruction was harmless only because the words intended to were in there. The U.S. government on page 32 of their answering brief in Vargas-Cordon had said so, and the Court of Appeals relied on that. Whereas here, the government seems to be sort of flipping its position with the greatest respect to my right. Well, they're entitled to do that. I understand that. S.G. does it all the time. And they have their structural argument. I mean, what's your answer to that, that you're making surplusage of knowing up front if the word harboring already has baked into it a specific intent requirement? Well, we don't think it's surplusage because of the other canonical indicators in there. We think that the way that the sentences are structured in there, the fact that you have no situ rassocis that comes into play because conceals, harbors, and shields from detection, they all have, in the Second Circuit's words, common core of meaning about hiding, evasion from detection, from immigration authorities. We think that the overwhelming canonical indicators, Justice Scalia's book, they seem to indicate... Which rule from the book would you cite us to? I think, oh, from Justice Scalia's book? Yeah. No situ rassocis would be... Oh, nosita? Nosita. I'm sorry, my Latin's never been good. That, do you recall? I'm sorry? Can you give me the English version of that rule? A word is known by the company it keeps. Okay, very good. All right, you get the gold star for that one. Oh, well, your honor is very kind. And I do want to point something out, a couple of things about harmless error, that there's cases they cite, Netter and Maslanyak, those were materiality cases. Those were not mens rea, missing or wrong mens rea from jury instruction cases. That's an important thing, because as the 10th Circuit explained in U.S. versus Conn, just a few months ago, February 3rd, 2023, as the court explained, when there's a mens rea problem in the jury instruction, the appellate courts need to be on high alert that they don't invade the province of the jury by stepping into the jury's shoes. And here, mens rea is very important, because with the wrong mens rea, much of America become criminals under this statute and under this jury instruction. That's why enforcing and policing a strong mens rea is of the utmost relevance and importance. And also, that avoids a saving construction problem, a void for vagueness problem, and the court, all else being equal, has, with the greatest respect, a duty to avoid such a constitutional tension. Thank you, your honors. All right, thank you. And the case is submitted.